UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

CHRISTINA BALKENBUSH, an
individual,

      Plaintiff,

  v.

ORTHO BIOTECH PRODUCTS,
L.P., a limited partnership,

      Defendant.

        )
        )
        )
        )
        )
        )

NO. CV-08-072-LRS

**ORDER RE SUMMARY
JUDGMENT MOTIONS**

**BEFORE THE COURT** is the Plaintiff's Motion For Partial Summary Judgment (Ct. Rec. 21), including Plaintiff's Motion To Strike, and the Defendant's Motion For Summary Judgment (Ct. Rec. 26). These motions were heard with oral argument on July 16, 2009. Michael H. Church, Esq., and Melody D. Farance, Esq. argued for the Plaintiff. Sheryl J. Willert, Esq., argued for the Defendant.

## I. BACKGROUND

This case was removed from Spokane County Superior Court based on diversity jurisdiction. Plaintiff Christina Balkenbush  asserts claims under the Washington Law Against Discrimination (WLAD), RCW Chapter 49.60, for age discrimination, gender discrimination, disability discrimination, hostile work environment (RCW 49.60.180), and for unlawful retaliation (RCW 49.60.210).

**ORDER RE SUMMARY
JUDGMENT MOTIONS-**       **1**

She also asserts claims for breach of contract, promissory estoppel, and wrongful withholding of wages (RCW 49.52.070).  All of these claims arise out of the termination of Plaintiff's employment by the Defendant, Ortho Biotech Products, L.P., (OB), a division of Johnson & Johnson (J & J).

Defendant moves for summary judgment on all of Plaintiff's claims. Plaintiff moves for summary judgment on her claims for disability discrimination, hostile work environment, unlawful retaliation, and wrongful withholding of wages under Washington law.[1]

## II.  MOTION TO STRIKE

Plaintiff moves to strike all exhibits attached to the Declaration of Sheryl  J. Willert in support of Defendant's Motion For Summary Judgment (Ct. Rec. 28) and all exhibits attached to the Declaration of Sheryl J. Willert in opposition to Plaintiff's Motion For Partial Summary Judgment (Ct. Rec. 42).  The basis asserted for the motion is that the exhibits have not been property authenticated.

For the reasons articulated in Defendant's Opposition To Plaintiff Motion To Strike Exhibits (Ct. Rec. 55), the motion to strike is **DENIED**.  Any problem with regard to authentication has been remedied by the Supplemental Declaration of Sheryl J. Willert (Ct. Rec. 46), and the declarations of Jeffrey Stewart, Brian Martin and Anita Tinney (Ct. Rec. 47, 48, and 49).

## III.  FACTS

Plaintiff first became employed by Defendant in January 1998 as a pharmaceutical sales representative.  By February 2007, she had attained the

---

[1]  By stipulation of the parties, all of Plaintiff's negligence-related claims have been dismissed.  (Ct. Rec. 34).

**ORDER RE SUMMARY JUDGMENT MOTIONS-        2**

position of territory manager  in Defendant's chronic care sales force.  On February 13, 2007, Plaintiff hosted a birthday dinner in Richland for one of her clients, Dr. Frank Cole.  Allegations arose out of this dinner concerning violations by the Plaintiff of company policy relating to customer meals.

On May 24, 2007, Plaintiff was interviewed in Seattle by Jeffrey Stewart, Vice President of Health Care Compliance (HCC) for Defendant, and Jerald Collins, Vice President of Human Resources for Defendant.  Plaintiff was asked to outline her February 13, 2007 training day with Daleen Yuranek.  Plaintiff did not mention the dinner with Dr. Cole.

On June 7, 2007, Plaintiff was interviewed again in Seattle by Stewart and Collins.  This interview took place in a hotel room and Defendant's Region Business Director, Parvinder (Par) Hyare, was also present during the interview.  During this interview, there was specific discussion regarding the February 13 dinner and whether Plaintiff had violated company policy regarding customer meals, and whether she had filed inaccurate expense reports.

Plaintiff went on short-term disability leave on June 8, 2007.   Prior to that date, in May 2007, Plaintiff had inquired about taking leave.  She spoke to Karen Porter about this.  Porter was District Manager for the Defendant from November 2004 to January 28, 2008, and was Plaintiff's direct supervisor from 2004 through 2007.  Mr. Hyare and Leah Neufeld, who worked in Human Resources for the Defendant, were informed that Plaintiff was interested in taking leave.

While she was on disability leave, Plaintiff received a letter from Defendant addressed to "Dear Former Employee."  This was a form letter providing information about possible employment opportunities with another company.  Plaintiff contacted Ms. Neufeld on September 19 to inquire about the letter and was told it had been sent in error.  Also while she was on disability leave, Plaintiff received a letter dated October 29, 2007, from JoAnn Stehr, Defendant's Director

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-**          **3**

of Human Resources, indicating that Plaintiff was to turn in all of her company property to the company (the Defendant).  Plaintiff contacted Stehr by e-mail on October 31 inquiring about the letter.  Plaintiff was advised the letter had been sent per standard company policy which is to retrieve employee equipment after 16 weeks of short-term disability leave.

On November 3, 2007, Plaintiff wrote to Carol Peccarelli, Vice President of Human Resources for Defendant, advising of her concerns regarding alleged discrimination, hostile work environment, and retaliation.  Plaintiff alleged that Defendant created a hostile work environment through its investigation of Plaintiff's alleged violations of company policies; alleged that Defendant discriminated against Plaintiff in the distribution of sales territories; and alleged that Defendant was retaliating against the Plaintiff for taking short-term disability leave.

On November 14, 2007, Plaintiff wrote to Ms. Peccarelli once again, asking for a response to Plaintiff's November 3, 2007 correspondence.  On November 28, 2007, Plaintiff spoke to Ms. Peccarelli.  Plaintiff's concerns were discussed. Plaintiff wrote to Ms. Peccarelli again on December 3, 2007 to document her concerns.

On December 4, 2007, Plaintiff had a conference call with Mr. Collins, Mr. Stewart, and Ms. Peccarelli.  During this conference call, Plaintiff was advised that she was being terminated from her employment.  Mr. Stewart provided the reasons for the termination, all of which related to the February 13, 2007 dinner. Paperwork for Plaintiff's termination was not processed until December 10 and 14, 2007.

In a December 14, 2007 conference call with Ms. Peccarelli, Mr. Collins, and Ms. Stehr, Karen Porter was advised that her employment was also being terminated.

**ORDER RE SUMMARY
JUMGMENT MOTIONS-        4**

On January 3, 2008, Plaintiff wrote to Ms. Stehr inquiring about the status of accrued vacation she was owed.  Plaintiff was owed pay for nine days of vacation and two floating holidays.  Defendant did not pay Plaintiff for her accrued vacation and holidays upon her termination from employment in December 2007.  On July 1, 2008, Defendant paid the Plaintiff at twice the normal rate for her accrued vacation and holiday pay.

Upon her termination, Plaintiff was offered severance compensation if she signed a Separation Agreement and Release.  Plaintiff declined to sign a Separation Agreement and Release.  She did not receive any severance compensation from the Defendant.


## IV.  DISCUSSION

### A.  Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*.  The party opposing

**ORDER RE SUMMARY JUDGMENT MOTIONS-**        **5**

summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

## B. Washington Law Against Discrimination (WLAD) Claims

In a disparate treatment discrimination case, the employee bears the initial burden of setting forth a prima facie case of unlawful discrimination. *Roeber v. Dowty Aerospace Yakima*, 116 Wn.App. 127, 135, 64 P.3d 691 (2003). An employee alleging discrimination must establish that he or she: (1) is in a protected class, (2) was discharged, (3) was doing satisfactory work, and (4) was replaced by someone not in the protected class. *Id*. The employee must present specific and material facts to support each element of the prima facie case. Failure to set forth a prima facie case of discrimination entitles the employer to judgment as a matter of law. *Id*.

A rebuttable presumption of discrimination temporarily comes into existence once the employee establishes a prima facie case of discrimination. The burden then shifts to the employer to present sufficient evidence of a legitimate and nondiscriminatory reason for the discharge. If the employer fails to meet this burden of production, the employee is entitled to an order establishing liability as a matter of law. If, however, the employer presents sufficient admissible evidence to raise a genuine issue of fact as to whether it discriminated against the employee,

**ORDER RE SUMMARY
JUDGMENT MOTIONS-       6**

the presumption established by the prima facie case is rebutted. The burden then shifts back to the employee who must then provide evidence that the employer's stated reason for the discharge is in fact pretext. *Id*. The employee must produce evidence that raises a genuine issue of material fact whether the reasons given by the employer for discharging the employee are unworthy of belief or are mere pretext for what is in fact a discriminatory purpose. *Sellsted v. Washington Mut. Sav. Bank*, 69 Wn.App. 852, 859-60, 851 P.2d 716 (1993).

In order to demonstrate on summary judgment that an employer's stated rationale for an employment decision was pretextual, the employee must produce evidence from which a trier of fact could infer that the employer's articulated reasons for the employment decision: (1) have no basis in fact; (2) were not really motivating factors for the decision; or (3) were not motivating factors in employment decisions for other employees in the same circumstances. *Dumont v. City of Seattle*, 148 Wn.App. 850, 867, 200 P.3d 764 (2009). Direct evidence of discriminatory intent is not required. Circumstantial, indirect and inferential evidence will suffice to discharge a plaintiff's burden. *Id*. at 867-68.

Whether judgment as a matter of law is appropriate depends on the strength of the employee's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence supporting the employer's case. If the record contains reasonable , but competing inferences of discrimination and nondiscrimination, the case should be determined by the trier of fact. The ultimate question is whether there is sufficient evidence to reasonably conclude that discrimination was a substantial factor in the employee's discharge. *Roeber*, 116 Wn.App. at 136. Generally, when an employee produces his or her prima facie case plus evidence of pretext, a trier of fact must determine the true reason for the action because the record contains reasonable but competing inferences of both discrimination and nondiscrimination. *Riehl v. Foodmaker,*

**ORDER RE SUMMARY JUDGMENT MOTIONS-     7**

*Inc.*, 152 Wn.2d 138, 150, 94 P.3d 930 (2004).  In employment discrimination cases, summary judgment in favor of the employer is seldom appropriate.  *Id.* at 144.  However, the mere existence of a prima facie case based on the minimum evidence necessary to raise a presumption of discrimination is insufficient to raise a genuine issue of material fact as to pretext.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

To make out a prima facie case of age discrimination, an employee must show that: (1) she was within the statutorily protected age group; (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a younger person.  *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 362, 753 P.2d 517 (1988).  The protected age group includes employees 40 years of age and older.  RCW 49.44.090(1).

To establish a prima facie case of gender discrimination, an employee must prove: (1) membership in a protected class; (2) the employee is qualified for the job or performing substantially equal work; (3) an adverse employment decision, including termination or denial of promotion; and (4) selection by the employer of a replacement or promoted person from outside the protected class.  *Kuest v. Regent Assisted Living, Inc.*, 111 Wn.App. 36, 44, 43 P.3d 23 (2002).

The WLAD prohibits an employer from discharging any person from employment on the basis of any sensory, mental, or physical disability.  RCW 49.60.180(2).  An employer who discharges an employee for a discriminatory reason faces a disparate treatment claim, while an employer who fails to accommodate an employee's disability faces an accommodation claim.  *Roeber*, 116 Wn.App. at 135.[2]

---

[2] As far as the court can discern, there is no accommodation claim in this case.  Defendant was provided with the short-term disability leave she requested.

**ORDER RE SUMMARY JUDGMENT MOTIONS-      8**

A prima facie case of disability discrimination requires a plaintiff to present evidence that she: (1) had a disability; (2) was able to do her job; (3) was discharged from employment; and (4) was replaced by someone who did not have a disability. *Riehl*, 152 Wn.2d at 150.

A plaintiff in a disability-based hostile work environment case must prove: (1) that she was disabled within the meaning of the WLAD; (2) that the harassment was unwelcome; (3) that it was because of the disability; (4) that it affected the terms or conditions of employment; and (5) that it was imputable to the employer. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 45, 59 P.3d 611 (2002).

To show a prima facie case of retaliation under RCW 49.60.210(1), a plaintiff must show that: (1) she opposed an activity forbidden by RCW Chapter 49.60; (2) that the defendant took an adverse employment action against her; and (3) retaliation was a substantial factor behind the adverse employment action. *Estevez  v. Faculty Club of the Univ. of Wash.*, 129 Wn.App. 774, 797, 120 P.3d 579 (2005); *Allison v. Housing  Authority of City of Seattle*, 118 Wn.2d 79, 85, 821 P.2d 34 (1991).

**1.  Prima Facie Case**

It is not readily apparent that Defendant seriously challenges whether Plaintiff has satisfied the prima facie elements of her age and gender discrimination claims, and her disability discrimination claim, other than her disability-based hostile work environment claim, and her disability-based retaliation claim.

With regard to age discrimination, there is no dispute that Plaintiff was over 40 years of age, that she was discharged from her employment, that she had been doing satisfactory work (with the exception of the alleged company policy

**ORDER RE SUMMARY
JUDGMENT MOTIONS-          9**

violations at issue herein)[3], and that she was replaced by a younger person (a man named Brendan Goehner).  Similarly, with regard to gender discrimination (other than any gender-related hostile work environment claim), there is no dispute that Plaintiff, a female and therefore a  member of a protected class, was qualified for the job she was performing (Territory Manager), was terminated, and was replaced by a male (Brendan Goehner).

With regard to disability discrimination, there appears to be no dispute that Plaintiff had a disability (stress-related depression)[4]; was able to do her job with a reasonable accommodation (short-term disability leave); was discharged from employment; and  was replaced by someone who did not have a disability (Brendan Goehner).

**a.  Retaliation**

Plaintiff's retaliation claim alleges Defendant terminated the Plaintiff after

---

[3] Her sales performance was very good and in slightly less than 10 years, Plaintiff had risen up through the ranks from a sales representative to a territory manager and her salary had risen in corresponding fashion.  (See Ex. 1 to Ct. Rec. 28 at p. 7 ).  Prior to the incident at issue which occurred in February 2007, Plaintiff had never been subject to investigation or any kind of disciplinary action.

[4] "Disability" is defined in the WLAD as the presence of a sensory, mental, or physical impairment that is:  (1) medically cognizable or diagnosable; or (2) exists as a record or history; or (3) is perceived to exist whether or not it exists in fact.  RCW 49.60.040(25)(a).  A disability does not have to be permanent; it can be temporary.  RCW 49.60.040(25)(b).  "Emotional illness" is recognized as an "impairment."  RCW 49.60.040(25)(c)(ii).

The record indicates that Defendant "perceived" that Plaintiff was suffering from an emotional impairment as evidenced by the fact that it assisted her in exploring leave options and never disputed Plaintiff's entitlement to and taking of short-term disability leave.

**ORDER RE SUMMARY JUDGMENT MOTIONS-        10**

she  reported her concerns that she was being discriminated against because of her disability.  Defendant contends Plaintiff cannot establish a prima facie case with regard to this claim because she reported her concerns after the decision had already been made to terminate her.  In other words, retaliation could not have been a substantial factor behind the adverse employment action because her statutorily protected activity (reporting her concerns about discrimination) did not occur until after the decision had already been made to terminate her.

Defendant contends the decision to terminate Plaintiff was made on June 7, 2007 (the same day of Plaintiff's second interview with Stewart, Collins and Hyare at the hotel room in Seattle), one day before  she went on short-term disability leave (June 8), and well before Plaintiff first reported her concerns to Ms. Peccarelli in November 2007.  Defendant contends the uncontroverted facts establish Plaintiff was not offered a position with Defendant upon the realignment of its sales force in June 2007, at which time Plaintiff was removed from the pool of candidates considered for post-realignment employment.[5] According to Defendant, "[r]egardless of whether Plaintiff was permitted to remain on the payroll during her leave so that she would have the benefits of employment, and regardless of the formal communication of her termination in December 2007, the adverse employment action occurred in June 2007 prior to any complaints of discrimination."

It is clear the decision to terminate the Plaintiff was not communicated to

---

[5]  Defendant offers a Declaration of Brian Martin (Ct. Rec. 48) in support of its assertion that Plaintiff was removed from the "candidate pool" prior to June 18, 2007.  Martin, a Senior Director, Business Analytics with Centocor Ortho Biotech Services, claims he created or last saved a document on June 18, 2007, which indicated that Plaintiff was among those who would not considered for a position post-realignment.  (Ex. 1 to Ct. Rec. 48).

**ORDER RE SUMMARY JUDGMENT MOTIONS-       11**

the Plaintiff until late November/early December 2007.  Plaintiff notes there is no written documentation evidencing that a decision had been made on June 7 to terminate her employment.  What Defendant presents as evidence is testimony from the "termination decision-makers" that they decided on June 7, at the conclusion of the interview with Plaintiff, to terminate her employment.  (Stewart Dep. at p. 129. Ex. attached to Ct. Rec. 25).  Defendant contends "[t]he termination decision-makers had no knowledge of any request by Plaintiff for leave prior to their decision to terminate her employment (on June 7)."  Defendant asserts that although the decision to terminate the Plaintiff was made on June 7, the termination itself had to be put on hold because before the decision to terminate could be communicated to the Plaintiff, she went on short-term disability leave on June 8.

There is a genuine issue of material fact whether a decision had been made on June 7 to terminate the Plaintiff.  The absence of any contemporaneous written documentation indicating a decision had been made on June 7 to terminate the Plaintiff raises a legitimate question whether in fact such a decision had been made on that date.  Furthermore, Leah Neufeld testified that while Plaintiff's claim for short-term disability had been referred on June 8 to a third-party (Reed Group) for management, it was not until June 25, 2007 that her claim was in fact approved.  (Neufeld Dep. at pp. 23-24, Ex. attached to Ct. Rec. 25).  If the claim was not approved until June 25, one has to ask what necessitated putting the termination on hold for the period between June 8 and June 25.  In other words, if there had been a decision to terminate the Plaintiff, why could it not have been communicated to her in the period between June 8 and June 25?  Finally, Defendant does not dispute that Plaintiff communicated to Defendant her decision to take short-term disability via a telephonic hotline and this was done on June 8 at approximately 5 p.m. Eastern Daylight Time (EDT), when it is questionable

**ORDER RE SUMMARY JUDGMENT MOTIONS-      12**

whether Stewart, Collins, Stehr or Peccarelli would still have been in their East Coast offices[6] to receive notice of such a call.  In other words, a legitimate question is raised whether the "termination decision-makers" had notice on June 8 that Plaintiff sought to take short-term disability thereby preventing them, as they assert, from promptly communicating to Plaintiff their decision to terminate her.

Because there is a genuine issue of material fact whether a decision had been made on June 7 to terminate the Plaintiff, there is a genuine issue of material fact whether Plaintiff was terminated at a later date (Nov./Dec. 2007) after she had communicated her concerns about discrimination to the Defendant.  Therefore, summary judgment  on Plaintiff's retaliation claim is not justified.

### b.  Hostile Work Environment

Plaintiff contends Defendant subjected her to a hostile work environment "when three male senior management employees [Stewart, Collins and Hyare] interrogated her in a harassing, intimidating, and condescending manner" about the February 13, 2007 Dr. Cole dinner.  While there is some suggestion that Plaintiff's hostile work environment claim has a sexual harassment component to it[7], it appears the claim is primarily based on Plaintiff's asserted disability.

### (1)  Nexus Between Disability And Harassment

Defendant contends Plaintiff has offered no evidence demonstrating a nexus

---

[6] Apparently, the East Coast offices are located in either Pennsylvania and New Jersey.

[7] Plaintiff, a female, was confined in a hotel room with three senior male employees.  Plaintiff maintains the door was closed.  There is a dispute whether there was a bed located in the room.  Plaintiff maintains there was.  The male employees do not recall there being a bed.

**ORDER RE SUMMARY JUDGMENT MOTIONS-        13**

between her disability and the motivations for the June 7 interview. "On the contrary," says Defendant, "the decision-makers were not aware of any claimed disability at the time they selected her for an interview" and "[t]he uncontroverted facts demonstrate that Plaintiff was selected for interviews because of her violations of company policy and because of her supervisory role within their district."

Apparently, when Defendant refers to "the decision-makers," it is referring to Stewart and Collins only. It is important, however, and cannot be ignored that Par Hyare was present during the June 7 interview. From the e-mail trail, it is reasonable to infer Hyare was aware of emotional problems the Plaintiff claimed to be experiencing prior to the interviews, and the fact she was exploring the possibility of taking leave in response to those problems. Stewart testified that following the June 7 interview, Hyare agreed with him and Collins that Plaintiff would have to be terminated. (Stewart Dep. at p. 129, Ex. attached to Ct. Rec. 25). According to Stewart, there was an agreement among the three of them to terminate Plaintiff, that they were going to seek final approval for that action, and that they were going to recommend termination. (*Id.*). A reasonable inference from Stewart's testimony is that Hyare was also a "termination decision-maker."

It appears Plaintiff contacted her district manager, Karen Porter, around May 16 or 17, 2007, inquiring about leave. In an e-mail dated May 16, 2007 sent to Leah Neufeld, Porter acknowledged receiving Neufeld's message regarding "Joann's comments for Christina and her time off." Presumably, this "Joann" was JoAnn Stehr. Porter advised Neufeld that Christina intended to seek five days of paid family leave, and another ten days of unpaid family leave. The e-mail indicates Hyare received a copy of the same (he was cc'd). (Ex. 53 at pp. 160-161, Ct. Rec. 42). On May 17, Neufeld responded to Porter in an e-mail advising precisely what Plaintiff's leave options were. Hyare was also copied on this e-

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-        14**

mail, and the e-mail advised that once Plaintiff selected how she wished to proceed, "she should submit her plan to you [Porter] and **cc: me and Par for final approval**." (Ex. 53 at pp. 159-60)(emphasis added). The e-mail also explained how the federal Family and Medical Leave Act (FMLA) worked in conjunction with Defendant's own short-term disability plan:

> FMLA provisions are maintained co-extensively with other types of leave. The Company has already established progressive medical and work and family leave policies prior to the enactment of FMLA. Therefore, many FMLA provisions overlap with existing Company policies. For example, an employee out on leave for 6 weeks for his/her own serious illness will be eligible for **short term disability** and concurrently, the 6 weeks will be counted as FMLA leave given that the illness meets the requirements of both leaves. FMLA leave is generally unpaid unless it pertains to a serious illness of an employee and qualifies concurrently as **Short-Term Disability (STD)**. The company will designate **short-term disability** as FMLA leave with regard to leave for the employee's own serious medical illness.

(*Id*.)(Emphasis added).

There is deposition testimony from Karen Porter that when Plaintiff contacted her about taking family leave, the first thing Porter did was contact her boss, Hyare, who instructed Porter to contact Ms. Neufeld. According to Porter: "And when I talked to Par I also told him [Plaintiff's] situation, asked him his thoughts. He thought it was sufficient enough to call Leah [Neufeld]." (Porter Dep. at pp. 51-52, Ex. attached to Ct. Rec. 25). According to Porter, Hyare told her to investigate short-term disability and family leave as options. (*Id*. at p. 53). In his deposition testimony, Hyare acknowledges speaking with Porter about Plaintiff and, in general, corroborates Porter's account of their interaction on the subject, but he does not recall there being any discussion about Plaintiff suffering from depression and anxiety, and denies discussing specific leave options. (Hyare Dep. at pp. 21-27, Ex. attached to Ct. Rec. 51-2).

//

//

**ORDER RE SUMMARY JUDGMENT MOTIONS-**        **15**

**(2) Objectively Abusive Conduct**

A hostile work environment claim requires consideration of the totality of the circumstances and whether the conduct involved words alone, or also included physical conduct.  *Clarke v. State Attorney General's Office*, 133 Wn.App. 767, 787, 138 P.3d 144 (2006).  The conduct must be both objectively abusive and subjectively perceived as abusive by the victim.  *Id.*

Defendant contends the June 7 single day interview lasting, at most, a couple of hours, could not have been objectively abusive because it could not constitute a pervasive and severe hostile working environment, which is generally recognized as what is necessary to support a hostile work environment claim.  Defendant cites authority from the Third Circuit and the Eastern District of Pennsylvania holding that isolated  or single incidents of harassment, including a single interview, do not constitute a hostile work environment.  *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 482 (3rd Cir. 1997); *Bedford v. Southeastern Pennsylvania Trans. Auth.*, 867 F.Supp. 288, 297 (E.D. Pa. 1994).

Plaintiff contends a single act can be enough, but acknowledges that repeated incidents create a stronger claim of hostile environment.  *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991); *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990).[8]  Plaintiff asserts there is at least a genuine issue of material fact whether the conduct of Stewart and Collins was objectively abusive considering:  (1) they repeatedly asked Plaintiff the same question in an effort to intimidate her into changing her answer, until she told

---

[8] In *Allen v. Global Advisory Group, Inc.*, 2009 WL 1457141 (Wash. App. Div. 1), the Washington Court of Appeals concluded a single act of sexual harassment was sufficient to raise a genuine issue of material fact that the plaintiff had been subjected to a hostile work environment, but the conduct at issue there involved physical sexual contact, as well as verbal sexual innuendo.

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        16**

them her answer was not going to change; and (2) Porter, who was subject to a separate interview by the same individuals (Stewart and Collins) on the same day (June 7) in the same hotel room, also found the behavior of Stewart and Collins to have been hostile and intimidating.

The court concludes that Plaintiff cannot establish a prima facie case for a disability-based hostile work environment. She has not provided sufficient evidence to create a genuine issue of material fact that she was subjected to a hostile work environment because of the June 7 interview. Both Plaintiff and Karen Porter were under investigation for alleged violations of company policy and so it is natural they would feel uncomfortable, and perhaps intimidated. Nevertheless, the court must emphasize that the fact Plaintiff was not subject to a hostile work environment on June 7, does not preclude the court from finding there is a genuine issue of material fact whether Defendant discriminated against the Plaintiff on the basis of disability (that Plaintiff's disability was a substantial factor in the decision to terminate Plaintiff). This is discussed *infra*.

### c. Conclusion

Plaintiff has met her burden of producing sufficient evidence to establish a prima facie case of age discrimination, gender discrimination, disability discrimination, and retaliation. Plaintiff has not, however, met her burden of producing sufficient evidence to establish a prima facie case for a disability-based hostile work environment claim. Judgment will be entered for Defendant on Plaintiff's disability-based hostile work environment claim.

### 2. Legitimate and Non-Discriminatory Reason For Discharge

There is no dispute that with regard to the February 2007 dinner she hosted for Dr. Cole, Plaintiff violated certain aspects of Defendant's Health Care

**ORDER RE SUMMARY JUDGMENT MOTIONS-**     **17**

Compliance (HCC) customer interaction policy.  The policy provides that "non-compliance . . . **could** result in dismissal" from employment.  (Emphasis added). While Plaintiff denies that she committed any violations, her focus is on whether any of the alleged violations were mere pretext for discrimination.  Plaintiff says that while she "may have made some mistakes in arranging for and expensing the February 13, 2007 dinner with Dr. Cole, it is not reasonable to conclude that those mistakes should have led to the termination of an otherwise high-performing employee."  (Plaintiff's Reply Brief, Ct. Rec. 53 at p. 12).  Plaintiff does not directly challenge Defendant's conclusion, or controvert Defendant's evidence, that in violation of company policy, Plaintiff: (1) improperly rented a limousine for the dinner and expensed only one portion of the trip; (2) used company funds to pay for meals for non-affiliated spouses; and (3) submitted conflicting and inaccurate expense reports.

Defendant has met its burden of producing sufficient evidence of a legitimate and non-discriminatory reason for discharging the Plaintiff from employment.  Therefore, the burden shifts back to the Plaintiff to produce sufficient evidence to at least raise a genuine issue of material fact that Defendant's articulated legitimate and non-discriminatory reason for discharge was mere pretext for discriminating and/or retaliating against the Plaintiff.

### 3.  Pretext

Plaintiff contends the sequence of events in her case constitutes sufficient circumstantial evidence to raise a genuine issue of material fact regarding the existence of pretext.

At about the same time as Plaintiff was inquiring about leave options (mid-May 2007), the Defendant was planning a "re-alignment" of territories.  Karen Porter testified during her deposition that she had a conference call with Par Hyare

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        18**

on or about May 15, 2007, during which Hyare advised district managers to start building cases against people the district managers would like to get rid of. (Porter Dep. at p. 91, Ex. attached to Ct. Rec. 25).  Porter testified that following the conference call, Hyare began calling each person in her (Porter's) district, inquiring if anyone was aware of someone else who may have violated a company policy.  Porter says she received calls from each of her territory managers who expressed concern and were upset about receiving the call from Hyare.  (*Id*. at 93).  Hyare does not deny that a re-alignment was occurring or was going to occur, but contends he did not tell Porter to weed out people, and denies calling representatives in Porter's district to inquire whether they were aware of individuals who had violated company policy.  Hyare claims he called the representatives to inquire about a complaint he had received about Porter from a particular representative.  (Hyare Dep. at pp. 53-54, Ex. attached to Ct. Rec. 51-2).

During her May 24 interview, Plaintiff was asked no questions about the Dr. Cole dinner, although Stewart acknowledged that was one of the reasons the interviews had been scheduled.  Stewart says Plaintiff would have been told that the purpose of the interviews was because of alleged HCC violations in the district.  Stewart contends that Plaintiff had an opportunity to bring up the Dr. Cole dinner during the interview because she was asked about her training day with Daleen Yuranek, but that she (Plaintiff) completely omitted mentioning the event.  Stewart claims he did not specifically want to bring it up because he did not have in his possession all of the documents related to the event.  (Stewart Dep. at pp. 75-81, Ex. attached to Ct. Rec. 25).  Although, on its face, it sounds plausible and reasonable that Stewart would wait to double-check his documentation before specifically confronting Plaintiff about the Dr. Cole dinner on a later occasion (June 7), this dinner had occurred several months earlier (February 2007).  Yuranek, a sales representative being trained by Plaintiff and

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        19**

who was present at the dinner, phoned in a complaint regarding the same, although it is unclear how soon the complaint was made after the dinner in February.[9]  In any event, it is reasonable to ask why, if the Dr. Cole dinner was of such concern, Stewart and Collins did not ask Plaintiff about it during the May 24 interview, or why they were not prepared to ask her about it during that interview.  Furthermore, Plaintiff notes that Dr. Cole, nor any other attendees at the February 13, 2007 dinner, were contacted by Defendant to obtain additional information about what happened during the dinner.  Stewart testified "nobody suggested" that Dr. Cole be contacted and that it was clear from the conversations with Plaintiff that the event had occurred as described by Yuranek.  Stewart says he also did not want to jeopardize the Defendant's relationship with Dr. Cole.  (Stewart Dep. at pp. 125-26, Ex. attached to Ct. Rec. 25).

A reasonable inference is that between May 24 and June 7, the Defendants learned that Plaintiff was experiencing emotional problems and exploring the possibility of taking disability leave, and in conjunction with the forthcoming re-alignment of sales territories, this, along with perhaps Plaintiff's age and/or gender, became factors in Defendant's decision to terminate the Plaintiff.  Supporting this inference is that, as discussed above, the first written documentation of the decision to terminate Plaintiff from her employment did not appear until several months later in November 2007.  The Plaintiff was not formally advised that she had violated company policies until November 28, 2007,

---

[9] There is no documentary evidence in the record regarding the complaint made by Yuranek.  The deposition testimony is equivocal as to when the complaint was made.  Collins testified he did not know when the complaint came in.  (Collins Dep. at pp. 55-56, Ex. attached to Ct. Rec. 25).  Stewart says the complaint could have been reported in March, April or May.  (Stewart Dep. at p. 59).

**ORDER RE SUMMARY
JUDGMENT MOTIONS-     20**

when she spoke to Carol Peccarelli.  In an e-mail Peccarelli sent to Collins following her conversation with Plaintiff, Peccarelli says she explained to Plaintiff that "she would have been terminated for the HCC violation had she not gone on disability" and that Defendant "waited to inform her when her disability was over." (Depo. Ex.32 at Ct. Rec. 38).[10]

Plaintiff seeks to further support her disparate treatment claim by asserting there were several other of Defendant's employees who were "similarly situated" and who committed violations of company policies, but were not terminated. These employees were identified by former district manager Karen Porter in a December 2007 conference call with Collins, Peccarelli, and Stehr.  Defendant notes that Porter did not complain about the conduct of these employees contemporaneously with their alleged conduct (which occurred in 2006) and therefore, management did not have an opportunity to respond to the complaints. Without evidence of contemporaneous complaints, Defendant asserts these employees were not "similarly situated" to the Plaintiff as a matter of law. *Yeager v. City Water and Light Plant of Jonesboro, Ark.*, 454 F.3d 932, 934 (8th Cir. 2006);  *Morrow v. Wal-Mart Stores*, 152 F.3d 559, 564 (7th Cir. 1998).

Defendant asserts the same is true with regard to an employee named Eilesh McCaffery, and that "Plaintiff's termination decision-makers were not involved with, or aware, of the conduct of Ms. McCaffery and thus did not have an opportunity to respond."  There is evidence, however, suggesting the "termination decision makers" were aware of the conduct of McCaffery, had a chance to respond to it, and did so respond.  Like Plaintiff, McCaffery was found to have submitted improper expense reports for among other things, client meals,

---

[10]   In her deposition testimony, Peccarelli testified she told Plaintiff on November 28, 2007, that Plaintiff was being terminated based on a decision made on June 7.  (Peccarelli Depo. at p. 125, Ex. attached to Ct. Rec. 25).

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-**        **21**

1    and for failure to comply with HCC policies regarding customer interaction.

2    Rather than being terminated from her position, McCaffery was given a "written

3    counseling memo" telling her what she needed to do to address her "performance

4    gaps." This memo, dated February 2, 2007, followed a meeting with McCaffery

5    that was held on the same date. February 2, 2007 was just days before the Dr.

6    Cole dinner at issue here with regard to Plaintiff. Moreover, the memo ( Ex. 8 to

7    Collins Depo.; Ct. Rec. 38), indicates it was copied (cc'd) to Par Hyare who, if not

8    himself a "termination decision-maker," certainly had the ear of the "termination

9    decision-makers" (Stewart and Collins). Plaintiff has produced evidence to at

10   least raise a genuine issue of material fact whether Eilesh McCaffery was an

11   employee "similarly situated" to Plaintiff, even if she has not succeeded in that

12   regard as to any of the other employees who were identified by Karen Porter (i.e.,

13   Kristin Small, Clayton Wright, Brendan Goehner).

14         Based on the totality of the circumstances, including evidence indicating

15   that Hyare was aware that Plaintiff was experiencing emotional problems and

16   exploring the possibility of taking leave, Plaintiff has produced sufficient evidence

17   to raise a genuine issue of material fact that the legitimate and non-discriminatory

18   reason offered by Defendant for Plaintiff's termination was mere pretext for a

19   discriminatory motive (age and/or gender and/or disability) that was a substantial

20   factor in the decision to terminate Plaintiff's employment. There is evidence from

21   which a reasonable inference can be drawn that Hyare was a "termination

22   decision-maker" in his own right. There is also evidence from which a reasonable

23   inference can be drawn that Hyare possessed information about Plaintiff's

24   disability and request for disability leave, as well as information about Eilesh

25   McCaffery, that he would likely have communicated to Stewart and/or Collins

26   prior to the May 24 and/or June 7 interview of Plaintiff. This is not a matter of

27   imputing knowledge to Stewart and/or Collins as a matter of law, but rather a

28

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        22**

factual question of whether knowledge on the part of Hyare was in fact communicated to Stewart and/or Collins.  In sum, a trier of fact could reasonably find that Plaintiff's age and/or gender and/or disability was a substantial motivating factor for Defendant's decision to terminate her employment.

### 4. Conclusion

The court will grant summary judgment to Defendant on Plaintiff's hostile work environment claim, but deny summary judgment on all of Plaintiff's other discrimination claims (age, gender, disability, and retaliation).  There are competing inferences of discrimination and non-discrimination.  A trier of fact should decide whether Defendant's articulated non-discriminatory reason for discharging the Plaintiff was mere pretext, or whether it was not and that Plaintiff's emotional problems were due  in whole or part to her knowledge that she had violated company policies and that she was on the proverbial "hot seat." The Plaintiff bears the ultimate burden of persuading the trier of fact that discrimination was a substantial factor in the Defendant's decision to terminate her employment.

### C. Wage Claims

### 1. Vacation And Holiday Pay

Plaintiff contends that even though Defendant eventually paid her double the amount due for her accrued vacation and holiday pay, she is still entitled to attorney's fees and costs incurred in obtaining her vacation and holiday pay.

RCW 49.52.070 provides that:

> Any employer . . . who shall violate any of the provisions of subdivisions (1) and (2) of RCW 49.52.050 shall be liable in a civil action by the aggrieved employee . . . for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-**          **23**

1    reasonable sum for attorney's fees . . . .

2    RCW 49.52.050(2) makes it a criminal misdemeanor for an employer to

3    "willfully and with intent to deprive the employee of any part of his wages, . . . pay

4    any employee a lower wage than the wage such employer is obligated to pay such

5    employee by any statute, ordinance, or contract."

6    Defendant contends it did not intend to deprive the Plaintiff of any of her

7    wages because it mistakenly believed she had not submitted the necessary

8    paperwork for payment of those wages. The critical determination in a case under

9    RCW 49.52.070 is whether the employer's failure to pay wages was "willful."

10   *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159, 961 P.2d 371 (1998). The

11   employer's refusal to pay must be volitional. The employer must know what he is

12   doing, intends to do what he is doing, and is a free agent. *Id*. at 159-60. Whether

13   an employer acts "willfully" is question of fact, but where there is no dispute as to

14   the material facts, summary judgment is proper. *Id*. at 160. There are two

15   instances when an employer's failure to pay wages is not willful: "the employer

16   was careless or erred in failing to pay, or a 'bona fide' dispute existed between the

17   employer and the employee regarding the payment of the wages." *Id*.

18   While it appears no "bona fide" dispute existed regarding Plaintiff's

19   entitlement to vacation and holiday pay, there is a genuine issue of material fact

20   whether Defendant was careless or erred in failing to pay. The July 1, 2008 letter

21   sent by Defendant to Plaintiff, in which payment for vacation and holidays was

22   enclosed, states:

23         As a follow up to the mediation discussions conducted on
         June 10, 2008, the representatives from the Company
24         further researched the allegation that your accrued, but
         unused vacation was not paid out to you when your
25         employment terminated on December 10, 2007.

26         As we reviewed the historical records, we discovered that
         you did indeed supply the information necessary to process
27         this payment in an e-mail sent to the company on January 3,

28

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-          24**

2008.  Unfortunately, during the transition out of the Company of the previous Human Resources person responsible for this case, this action was never initiated.

It was not our intention to withhold these payments, as we were under the mistaken belief that we were waiting for information to be submitted by you to process.  As such, you are owed payment corresponding to eleven (11) days, representing nine (9) of which were unused vacation days and two (2) of which were unused floating holidays.

The payment enclosed reflects a doubling of these days, as per our understanding of Washington law.

(Ex. 1 to Ct. Rec. 49).

While Defendant's payment of double the amount of accrued vacation and holiday pay is arguably an implied admission that it "willfully" withheld said pay, and therefore that it should also have to pay attorney's fees and costs, that is for the trier of fact to decide.  The trier of fact should decide if the Defendant in fact made a mistake.  There is a genuine issue of material fact whether Defendant "willfully" withheld accrued vacation and holiday pay from the Plaintiff.

**2.  Severance Pay**

Plaintiff contends she is entitled to four weeks of severance pay in the sum of $7,792.32, and an additional $7,792.32 as double damages pursuant to RCW 49.52.070, as well as attorney's fees and costs.  Plaintiff contends she is entitled to this severance pay pursuant to the Defendant's Severance Pay Plan.

Defendant contends Plaintiff was ineligible for severance under the Defendant's Severance Pay Plan because she was terminated for misconduct. According to Defendant, in some cases, an employee who is not eligible for severance pay under the Plan will be offered non-Plan payments in exchange for signing a Separation Agreement and Release.  Defendant contends that although it offered severance to the Plaintiff, it was not under the Plan and therefore, when Plaintiff declined to sign a Separation Agreement and Release, she forfeited the

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        25**

right to receive any payments.

In a letter to the Plaintiff dated December 10, 2007, Collins confirmed Plaintiff's "separation" from the company and advised the Plaintiff she was being offered a Separation Agreement and Release which included the following terms:

1. You will be paid at your present base rate of pay through the Separation Date. You will also be paid for any untaken vacation days accrued through the Separation Date [December 10, 2007].

2. If you enter into this Agreement and comply with all of the conditions described below, the Company will provide you with payments as follows:

**Total gross amount of your SEVERANCE PAY: 18 WEEKS AT $1,948.08 PER WEEK= $35,065.38.**

(Ex. 86 to Ct. Rec. 42 at Page 268)(emphasis added). At his deposition, Collins acknowledged that this severance was offered pursuant to the "Severance Pay Plan Of Johnson & Johnson And Affiliated Companies" (Plan), effective January 1, 2007. (Collins Dep. at p. 130, Ex. attached to Ct. Rec. 25).

Under Article 4 of the Plan, an "Eligible Employee" is not entitled to the benefits provided in Article 5 of the Plan if her employment has been terminated as a result of "discharge for (i) misconduct, (ii) violation of applicable rules, policies, and/or practices or (iii) conduct considered by the Pension Committee to be detrimental to a Johnson & Johnson Company." (Ex. 86 to Ct. Rec. 42 at pp. 279-80). Article 5 provides for the "Amount and Payment of Benefits" under two different formulas. Formula 1 is "Basic Severance Pay" and applies only if a "participant" does not sign a Separation Agreement and Release. (Ex. 86 at p. 282). A "Participant"is defined in the Plan as an "Eligible Employee." (Ex. 86 at p. 276). Basic Severance Pay consists of four weeks of compensation, without regard to years of service. Formula 2 is "Enhanced Severance Pay" and applies only if a "participant" signs a Separation Agreement and Release which becomes effective. (Ex. 86 at p. 282). The $35,000 the Plaintiff was offered if she signed

**ORDER RE SUMMARY JUDGMENT MOTIONS-**       **26**

the Separation Agreement and Release was apparently intended as "Enhanced Severance Pay."

Plaintiff was terminated, purportedly, for "violation of applicable rules, policies, and/or practices."  That was the reason stated by the Defendant.  Whether or not that was in fact the reason for Plaintiff's termination is another question, as discussed *supra*.  Notwithstanding Plaintiff's apparent ineligibility to receive severance payments under the Plan, the record indicates the Defendant offered the Plaintiff a severance payment under the Plan**.**  Indeed, the Defendant was willing to pay the Plaintiff $35,000 if she signed the Separation Agreement and Release. She did not do so and therefore,  per the terms of the Plan, she was not entitled to Enhanced Severance Pay (18 weeks).  Per the terms of the Plan, however, even if she did not sign the Separation Agreement and Release, Plaintiff was entitled to Basic Severance Pay (4 weeks).

The record indicates Defendant's offer of severance to the Plaintiff was pursuant to the Plan.  Pursuant to the Plan, even if Plaintiff did not sign the Separation Agreement and Release, she was entitled to four weeks of severance pay.  If Plaintiff was not an "Eligible Employee" because she had violated company policies,  the Defendant did not have to offer the Plaintiff any severance at all.  Perhaps Defendant was willing to overlook that as long as it could get Plaintiff's signature on a Separation Agreement and Release.[11]  The December 10, 2007 letter to the Plaintiff did not expressly advise her that she would receive four weeks of severance pay if she did not sign the Separation Agreement and Release. A reasonable inference, however, is that Defendant's offer of Enhanced Severance Pay under the Plan necessarily implied an offer of Basic Severance Pay under the

---

[11]  The definition of "Separation Agreement and Release" contained in the Plan assumes it is being tendered to an "Eligible Employee."  (Ex. 86 at p. 276).

**ORDER RE SUMMARY
JUDGMENT MOTIONS-     27**

Plan even if Plaintiff did not sign a Separation Agreement and Release.  The court believes, however, it is inappropriate to decide this issue as a matter of law.  There is a genuine issue of material fact whether Defendant waived any right to deny Basic Severance Pay to Plaintiff, notwithstanding that Plaintiff may not have been "eligible" for severance pursuant to the terms of the Plan, and notwithstanding her refusal to sign a Separation Agreement and Release.  In turn, there is a genuine issue of material of fact whether Defendant's refusal to pay four weeks of severance to the Plaintiff constitutes a breach of contract or alternatively, a breach of a non-contractual promise on which the Plaintiff reasonably relied to her detriment.

## V.  CONCLUSION

Plaintiff's Motion For Partial Summary Judgment (Ct. Rec. 21) is **DENIED**. Defendant's Motion For Summary Judgment (Ct. Rec. 26) is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** with regard to Plaintiff's disability-based hostile work environment claim.  It is **DENIED** with regard to all of Plaintiff's other claims (age discrimination, gender discrimination, disability discrimination, retaliation, statutory wage claim, breach of contract/promissory estoppel claims).

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this order and to provide copies to counsel.

**DATED** this ___5th___ day of August, 2009.


*s/Lonny R. Suko*
_____
LONNY R. SUKO
Chief United States District Judge


**ORDER RE SUMMARY
JUDGMENT MOTIONS-        28**